IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    John Lee Peete,                             Case No. 21-23863-beh

            Debtor.                        Chapter 13

## DECISION AND ORDER ON (1) THE DEBTOR'S OBJECTION TO CLAIM AND (2) THE CITY OF MILWAUKEE'S OBJECTION TO PLAN CONFIRMATION

      This is not the first time courts have been asked to decide whether an exaction by a governmental entity is a tax or a fee. Here, the City of Milwaukee filed an amended proof of claim, asserting that the debtor owes it $26,754.99 as a priority property tax claim. But ninety-percent of that amount represents special charges. The City's tax bill allocates the special charges into four categories: delinquent municipal services, delinquent storm water account, delinquent water account, and "total other special." The debtor objected to the priority portion of the City's claim, contending that the special charges are not property taxes and should be treated like other general unsecured claims. His amended Chapter 13 plan reflects that view. The City objected to the debtor's plan, arguing that the plan could not be confirmed because it does not pay the priority portion of the City's claim in full.

      The two objections present one primary legal question: are each of the special charges included in the debtor's 2020 property tax bill a property tax, or are they fees, and therefore not entitled to priority treatment under 11 U.S.C. § 507(a)(8)(B)?[1] A second question, raised by the Court, is whether any portion of the "interest and penalties" included in the 2020 tax bill are entitled to priority status. In light of the City's burden of proof in establishing priority

---

[1] The debtor makes a further, contingent argument that even if the special charges are "property taxes," they do not qualify for priority treatment because they were not "last payable without penalty after one year before the date of the filing of the petition," which is an additional requirement of section 507(a)(8)(B).

status, and applying a functional analysis to the supplemented record offered by the parties, the Court concludes that neither the special charges (and their corresponding prepetition interest) nor the penalties are entitled to priority treatment under 11 U.S.C. § 507(a)(8).

## FACTUAL BACKGROUND

The City's amended proof of claim asserts a total debt of $46,754.99 for delinquent real estate taxes from 2014 through 2020, of which $20,000 is secured by the debtor's real estate. The City contends that the remaining $26,754.99 is entitled to priority status under 11 U.S.C. § 507(a)(8)(B), which applies to "allowed unsecured claims of governmental units, only to the extent that such claims are for . . . a property tax incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition."

**A.    The Proof of Claim**

Attached to the City's amended proof of claim is Exhibit A, dated July 7, 2021, which sets out the various components of the City's claim. The total unpaid balance of real estate tax bills issued to the debtor from 2014 through 2019 is $19,591.42, while a total of $27,163.57 is attributable to the 2020 tax bill. Because the parties agree that the unpaid balance through 2019, as well as a small portion of the unpaid 2020 tax bill, is secured by the debtor's real estate (valued at $20,000), the Court's inquiry is limited to whether the charges on the 2020 tax bill are entitled to priority status.

The unpaid balance of the 2020 tax bill comprises several parts. The amounts originally billed to the debtor include a "tax principal" of $903.36 and "special charges" of $24,229.18. The tax bill allocates these special charges into four categories: $746.19 for delinquent municipal services, $1,033.48 for a delinquent storm water account, $1,960.37 for a delinquent water account, and $20,489.14 for "total other special" (which, as explained below, includes charges for health abatement, a delinquent sewer account, and building reinspections).

The City submitted affidavits from two employees—(1) Samantha Meagher, a Water Collections Supervisor with the City of Milwaukee Water Works (MWW), and (2) Tanz Rome, Business Operations Manager with the City of Milwaukee's Department of Neighborhood Services (DNS)—to clarify the further breakdown of the special charges:

- <u>Delinquent municipal services:</u> The $746.19 included on the tax bill consists of an unpaid municipal services bill in the amount of $678.35 at the time it was added to the tax rolls, plus a 10% penalty of $67.84;[2]

- <u>Delinquent storm water account:</u> The $1,033.48 included on the tax bill consists of an unpaid balance of $939.53 at the time it was added to the tax rolls, plus a 10% penalty of $93.96;[3]

- <u>Delinquent water account:</u> The $1,960.37 included on the tax bill consists of an unpaid water bill of $1,782.15 at the time it was added to the tax rolls, plus a 10% penalty of $178.22;[4]

- <u>Total other special:</u> The $20,489.14 for "total other special" charges included on the tax bill consists of the following:

  - $874.06 for "Health Abatement" ($620.30 in charges for litter cleanup, plus "IT Surcharges" of $13.76 and cumulative "Administrative Costs" of $240);[5]

  - $1,093.08 in delinquent sewer account charges, with $993.71 attributable to the unpaid account balance at the time it was added to the tax rolls, and $99.37 as a 10% penalty;[6] and

  - $18,522 for "Building Reinspection," which includes "IT Surcharges" of $39.20.[7]

---

[2] *See* ECF No. 121 ("Meagher Aff."), at ¶ 6. According to Meagher, "[w]hen a request is made to add MWW-related outstanding account balances to the tax rolls, the amount requested includes a 10% penalty per Wisconsin Statute § 66.0809(3)(a)." *Id.* at ¶ 3.

[3] *See id.* at ¶¶ 7, 3.

[4] *See id.* at ¶¶ 5, 3.

[5] *See* ECF No. 123 ("Rome Aff."), at ¶¶ 5, 10–11. As Rome explains: "An additional 'IT Surcharge' is added to balances when health abatement measures are not taken by the property owner." *Id.* at ¶ 9.

[6] *See* Meagher Aff. at ¶¶ 8, 3.

[7] *See* Rome Aff. at ¶¶ 5, 8. As Rome describes, "DNS institutes monthly building reinspections when a property is found to be below code and the issues are not remedied. When DNS has to conduct reinspections, an 'IT Surcharge' is added to the cost imposed for the reinspection." *Id.* at ¶¶ 6–7.

Despite two opportunities to supplement the record, and the filing of four affidavits, the City has failed to explain the nature or purpose of the underlying charges imposed by Milwaukee Water Works for "municipal services," "storm water account," "water account," and "sewer account." So, it is not apparent from the record whether any delinquent charges included on Mr. Peete's 2020 tax bill were assessed to collect funds to pay for a public benefit, or were imposed to compensate the City for services provided to Mr. Peete specifically (in other words, to raise revenue used for the benefit of the individual owner of the property upon which the charges were assessed).

Altogether, the amounts billed in 2020 for "tax principal" and "special charges" total $25,132.54, of which $24,920.70 remains unpaid.[8]

The "interests & penalties" on the unpaid balance are $2,242.87. According to a declaration of City employee Samantha Jackson, this amount represents a 6% interest charge ($1,495.25) and a 3% penalty charge ($747.62) on the unpaid balance of $24,920.70. *See* ECF No. 122.

## B. Wisconsin Statutory and Administrative Scheme

The City of Milwaukee's ability to collect arrearages for municipal water services is governed by Wis. Stat. § 62.69(2)(f), which provides:

> All water rates for water furnished to any building or premises . . . are a lien on the lot, part of lot or parcel of land on which the building or premises is located. If any water rates . . . remain unpaid on October 1, the unpaid rates . . . shall be certified to the city comptroller on or before November 1, and shall be placed by the comptroller upon the tax roll and collected in the same manner as other taxes on real estate are collected in the city. . . .

Wis. Stat. Ann. § 62.69(2)(f).[9]

In addition, Wis. Stat. § 66.0809(3)(a), which Ms. Meagher cites as the basis for the City to add a 10% penalty when MWW-related delinquent account

---

[8] There is no evidence in the record to explain how the difference of $211.84 ($25,132.54 – $24,920.70) was applied to reduce the balance of the original tax bill.

[9] This enforcement mechanism extends to storm and sewer water services by virtue of Wis. Stat. § 66.0821(4)(d): "Sewerage service charges shall be collected and charged and shall be a lien upon the property served in the same manner as water rates are charged and collected under s. 62.69(2)(f) or 66.0809 to the extent applicable . . . ."

balances are added to the tax rolls, describes how any delinquent amounts will be added to the tax bill as special charges:

> . . . [O]n October 15 in each year notice shall be given to the owner or occupant of the lots or parcels of real estate to which utility service has been furnished prior to October 1 by a public utility operated by a town, city, or village and payment for which is owing and in arrears at the time of giving the notice. The department in charge of the utility shall furnish the treasurer with a list of the lots or parcels of real estate for which utility service charges are in arrears, and the notice shall be given by the treasurer, unless the governing body of the city, village, or town authorizes notice to be given directly by the department. The notice shall be in writing and shall state the amount of arrears, including any penalty assessed pursuant to the rules of the utility; that unless the amount is paid by November 1 a penalty of 10 percent of the amount of arrears will be added; and that unless the arrears, with any added penalty, are paid by November 15, the arrears and penalty will be levied as a special charge, as defined under s. 74.01(4), against the lot or parcel of real estate to which utility service was furnished and for which payment is delinquent. . . . .

Wis. Stat. § 66.0809(3)(a).

As for reinspection fees, Milwaukee Code of Ordinances § 200-33-48 governs:

> REINSPECTION FEE.
>
> a. To compensate for inspectional and administrative costs, a fee of $175 may be charged for any reinspection to determine compliance with an order to correct conditions of provisions of the code under the jurisdiction of the department of neighborhood services or assigned to the department, except no fee shall be charged for the reinspection when compliance is recorded. A fee of $350 may be charged for each subsequent reinspection. Reinspection fees shall be charged against the real estate upon which the reinspections were made, shall upon delinquency be a lien upon the real estate and shall be assessed and collected as a special charge for payment and settlement as provided in ch. 19 of the city charter.

Section 19-12 of the Milwaukee City Charter describes how delinquent reinspection fees are to be placed on the property tax bill:

> In all cases where . . . any special charge or assessment is made a lien upon land, the amount of such charge or assessment shall be carried out on the tax roll in a separate column or columns, opposite the lot or tract upon which the same may be a lien; and the treasurer may collect and

sell, and do all other acts in relation thereto, in the same manner as if the amount of such lien was a general tax.

Finally, regarding health abatement charges for litter removal, section 17-12 of the Milwaukee City Charter provides a similar collection mechanism:

> 17-12. Abatement of Nuisances. 1. ABATEMENT. The commissioner [of health] may, in all cases where it is necessary for the speedy execution of the commissioner's orders, cause any conditions or practices of nuisances referred to in this chapter to be abated or removed at the expense of the city. The commissioner shall also cause any conditions or practices or nuisances which may exist upon the property of nonresident owners, or upon property, the owners of which cannot be found or are unknown and cannot be ascertained, to be abated or removed in like manner, at the expense of the city. The sums expended in the abatement or removal of such conditions or practices or nuisances shall be a lien, in the same manner as any tax upon real estate, upon the lots or premises from or upon which conditions or practices or nuisances are abated or removed.
>
> 2. SPECIAL ASSESSMENT. The commissioner shall certify to the comptroller the description of such property and the cost of abating and removing such conditions or practices or nuisances thereon. The comptroller shall include the same in the annual schedule of lots subject to special taxation, and payment thereof may be enforced in like manner as other special taxes upon real estate are levied and collected. . . .

Likewise, Milwaukee Code of Ordinances § 79-12 (which is enforced by the department of neighborhood services, department of health, and the department of public works), prohibits the littering of premises, while § 79-16-2 allows the City to impose special charges for the removal of such litter:

> 2. LEIN.[sic] a. If any owner or agent fails, omits, neglects or refuses to obey any order from the department of public works or the department of neighborhood services, the appropriate department may take such steps as are necessary to remove the litter, . . . and pursuant to s. 66.0627, Wis. Stats., a special charge shall be made against the subject property for litter removal . . . .
>
> . . .
>
> a-3. Special charges made under this subsection shall be due and payable 30 days after billing or if not paid within that time become a lien on the subject property as provided in s. 66.0627, Wis. Stats. Such lien shall take effect as of the date of the delinquency and shall include an administrative charge of $10. . . . .

Wis. Stat. § 66.0627(4), in turn, authorizes the City to place any delinquent charges on the property tax bill:

> A special charge is not payable in installments. If a special charge is not paid within the time determined by the governing body [of a city, village, or town], the special charge is delinquent. A delinquent special charge becomes a lien on the property against which it is imposed as of the date of delinquency. The delinquent special charge shall be included in the current or next tax roll for collection and settlement under ch. 74.

Wis. Stat. § 66.0627(4).

The February 22, 2022 declaration of Mr. Dennis Yaccarino, the budget and management director for the City's Department of Administration, describes how taxpayer payments for various municipal services are used, both before and after inclusion on the tax roll. He attests:

> Prior to inclusion on the tax roll, any payments received by Milwaukee Water Works for water, storm water, sewer charges, and other Milwaukee municipal services charges are received by the Milwaukee Water Works and are used to offset costs within Water, Sewer Maintenance, Sewer User and General Funds.
>
> As soon as any debts for water, storm water, sewer charges, and other Milwaukee municipal services charges are placed on the City's tax roll for inclusion in an upcoming tax bill, the respective funds are credited as though they received payment for those debtors.
>
> After inclusion on the tax roll, any payments received by the Treasurer's Office for water, storm water, sewer charges, and other Milwaukee municipal services charges that were previously with the Milwaukee Water Works go into the general fund along with property tax payments received by the City and offset general City spending.
>
> Prior to inclusion on the tax roll, payments received by the City of Milwaukee resulting from notices issued by the Department of Neighborhood Services or Department of Public Works, such as building re-inspection, service fees, and health abatement fees, go into the City's general fund along with property tax payments received by the City and offset general City spending.
>
> After inclusion on the tax roll, payments received by the Treasurer's Office resulting from notices issued by the Department of Neighborhood Services or Department of Public Works, such as building re-inspection, service fees, and health abatement fees, go into the City's general fund

along with property tax payments received by the City and offset general City spending.

ECF No. 111-1, ¶¶ 6–10. What Mr. Yaccarino neglects to explain, however, is why the various components of any of the special charges are assessed in the first instance—to fund a public service, or to recover the cost of delivering a service to an individual property owner?

## ARGUMENTS OF THE PARTIES

To fully adjudicate the pending objections, the Court must answer two questions:

(1) To what extent, if any, are the various components of the special charges included in the debtor's 2020 property tax bill a "property tax" (and if a property tax, whether and to what extent such tax was "last payable without penalty after one year before the date of the filing of the petition" to be afforded priority status under 11 U.S.C. § 507(a)(8)(B))?

(2) To what extent, if any, are the "interest and penalty" charges related to the 2020 tax bill entitled to priority status, and on what basis?

**A.    The Special Charges**

The City considers that the various municipal charges unpaid and thereafter added to the debtor's property tax bill are all "property taxes" entitled to priority treatment under 11 U.S.C. § 507(a)(8)(B). The Bankruptcy Code does not define the terms "tax" or "property tax," *see* 11 U.S.C. § 101, so courts are left to conduct a "functional examination" of whether any particular charge should be considered a property tax. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 224 (1996). The City urges the Court to focus its examination on whether the charges at issue are in the nature of a property tax, rather than rely on state law definitions, citing *In re New England Carpet Co., Inc.*, 26 B.R. 934, 937 (Bankr. D. Vt. 1983), and *In re Adams*, 17 B.R. 742, 743 (Bankr. E.D. Pa. 1982), *overruled*, 40 B.R. 545 (E.D. Pa. 1984). According to the City, the special charges, in character and effect, are virtually indistinguishable from a property tax.

The City also directs the Court to decisions in which courts have employed multi-factor tests to determine whether an obligation owed to the

government is a tax under federal bankruptcy law, including *County Sanitation Distr. No. 2 v. Lorber Indus. Of Cal, Inc.* (*In re Lorber)*, 675 F.2d 1062, 1066 (9th Cir. 1992) and *In re S.N.A. Nut Co.,* 188 B.R. 392, 393–94 (Bankr. N.D. Ill. 1995). Under the four-pronged test described in *Lorber*, an exaction qualifies as a priority tax if it is (1) an involuntary pecuniary burden, regardless of name, levied upon individuals or property; (2) imposed by or under the authority of the legislature; (3) for public purposes, including defraying expenses of government or of undertakings authorized by government; and (4) under the police or taxing power of the state. *See* 675 F.2d at 1066. The City applies the *Lorber* factors to urge that the municipal charges against Peete's property here are involuntary, are pecuniary burdens placed on all property owners and the property itself in proportion to usage and needs. When the charges are added to the tax rolls, the City argues, they are collected under the taxing authority of the municipality.

The debtor, on the other hand, argues that the various municipal charges are not "property taxes," because those monies represent charges for services actually used by the individual taxpayer, *i.e.*, water, sewer, and special services. He contends that Wisconsin statutes provide the necessary definitions. General property taxes are defined in Wis. Stat. § 74.01(1) as "taxes levied upon general property . . . and measured by the property's value." The statute continues:

> "Special charge" means an amount entered in the tax roll as a charge against real property to compensate for all or part of the costs to a public body of providing services to the property. "Special charge" includes any interest and penalties assessed for nonpayment of the special charge before it is placed in the tax roll. "Special charge" also includes penalties under s. 70.995(12).

Wis. Stat. § 74.01(4).

According to Mr. Peete, because the special charges are not based on the property's value, and are separately defined under state law, they should not be considered "property taxes" for purposes of § 507(a)(8)(B) and therefore not afforded priority status. ECF No. 105.

Both parties consider the holding in *In re Grede Foundries*, 651 F.3d 786 (7th Cir. 2011), and each derive a different type of guidance from that decision. In *Grede*, the debtor owed delinquent utility charges to the local municipal utility, which then sent the debtor notices of its intent to place the unpaid balance on the property tax roll as a lien against the debtor's property in accordance with Wis. Stat. §§ 66.0809 and 66.0627. The issues on appeal included whether the municipal utility's actions were subject to two exceptions from the automatic stay: section 362(b)(9), which allows government entities to determine the amount of tax due and send the bill to the taxpayer/debtor without violating the automatic stay, and section 362(b)(18), which allows the "creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property."

The Seventh Circuit concluded that the first stay exception did not apply, because the utility charges were not a "tax," explaining:

> . . . Reedsburg's utility charges in no sense constitute a tax despite the fact that they potentially end up on a property tax bill among genuine taxes, *see* Wis. Stat. § 74.11(12) (distinguishing "delinquent utility charges" from other taxes). We note that Wis. Stat. § 66.0809(3) states that arrears for utility services "will be levied as a tax." But the phrase "as a tax" simply gives a municipality the ability to collect the unpaid charge *as if* the charges were a tax, or "in the same way or manner" of a tax. *See, e.g., Webster's Third New Int'l Dictionary* 125 (1986) (defining "as").

> Even if the phrase "as a tax" somehow transformed the utility charges into a tax, state law terms are not dispositive in bankruptcy law. . . . Instead, we look to the state statute merely to determine whether "its incidents are such as to constitute a tax within the meaning" of the Code provision. . . . A tax is generally defined as a source of revenue that provides general benefits to the public. . . . . The utility charges in this case do nothing more than recover Reedsburg's costs of delivering utility services. Because the utility charges are not taxes, the § 362(b)(9) exception does not apply to Reedsburg's actions.

651 F.3d at 794–95.

The appellate court likewise concluded that the second stay exception did not apply because the utility charges were not a special assessment:

> Reedsburg argues that the unpaid utility charges are either a special tax or special assessment. We disagree. As we held above, the unpaid utility charges are not taxes. The charges do not raise revenue; they pay for utility services Reedsburg provided Grede. And there is nothing "special" about them. They are regular, run-of-the-mill delinquent charges (although quite large) for routine everyday utility services.
>
> . . .
>
> The utility charges do not defray the cost of improving Grede's property or benefit Grede's property in any particular way; Reedsburg's provision of electricity (along with providing water and sewer services) allowed Grede to heat vats of molten steel. Stretching the defraying of real property improvement costs to include the provision of utility services is not a plausible interpretation of this exception. We appreciate that Congress wanted to reverse decisions holding that the automatic stay prevented municipalities from attaching liens for property taxes accruing after a bankruptcy filing, but if Congress wanted to sweep prepetition utility charges into this exception, it would have done so using more explicit language. Because Reedsburg's utility charges do not qualify as special taxes or special assessments, the § 362(b)(18) exception does not apply to Reedsburg's actions.

*Id.* at 795–96.

Here, the City argues that *Grede* is of little precedential value because Wis. Stat. § 62.69, rather than Wis. Stat. § 66.0809(3), applies to utility charges assessed by a first-class city like Milwaukee. The former statute provides that water rates "are a lien" on property when services are provided, while the latter requires additional action by a municipality (notice and filing a list with the county clerk) before delinquent charges "become a lien" on property. *See* ECF No. 111, at 2. This distinction, however—even if it were correct[10]—is more relevant to an issue not in dispute here: *when* and *how* a

---

[10] The City's argument ignores that *both* Wis. Stat. § 62.69 and § 66.0809(3) govern public utility charges. *See, e.g., supra* note 2 (City employee Samantha Meagher averring that Wis. Stat. § 66.0809(3)(a) applies to MWW-related outstanding account balances added to the tax rolls). In *In re U.S. Leather, Inc.*, 271 B.R. 306 (Bankr. E.D. Wis. 2001), another court in this district was asked to determine when a lien arose in favor of the City of Milwaukee for unpaid water and sewer charges under the prior versions of Wis. Stat. §§ 62.69(f) and 66.0809(3)—Wis. Stat. §§ 66.071(1)(e) and 66.069(1)(b), respectively, which were amended and renumbered by 1999 Wisconsin Act 150. After considering the relevant statutory language, the

municipality obtains an interest (or a lien) in a debtor's real property. As Mr. Peete observes:

> The greater issue is not how the lien is created, but whether once the secured lien claim is determined to be unsecured under 11 USC 506, the remaining unsecured debt is entitled to priority . . . and in order to be a priority property tax debt, the debt must first be a tax. *Grede* says that a tax must do something other than recover the cost of delivering services – a tax raises revenue and is not a recovery of an expense. A charge for services provides reimbursement of a cost. Under *Grede,* the charges here are thus not taxes.

ECF No. 112, at 2.

The debtor also points to Mr. Yaccarino's statement that payments for special charges "are received by the Milwaukee Water Works and are used to offset costs." He notes that *Grede* does not ask into which account the payments go, but instead focuses on the reason for their collection. The determinative distinction, according to the debtor, is that the charges were not incurred to generate revenue, but to recover actual costs. Last, Mr. Peete contends that the placing of charges for delinquent services into the general fund muddies the City's argument, instead of resolving it.

Mr. Peete's secondary argument is that even if the special charges at issue are property taxes, they are not entitled to priority status because they are payable only with a penalty—at least that is so for the charges collected by MWW in accordance with Wis. Stat. § 66.0809(3)(a), which imposes a 10%

---

court concluded that delinquent charges do not become a lien on property under either statute until after the charges are unpaid, notice is given, and the city comptroller places the charges on the tax rolls. *See* 271 B.R. at 312–13. Although the language the *U.S. Leather* court considered in § 66.071(1)(e), which stated that water charges "shall be" a lien on the lot, is slightly different from current § 62.69(f), which provides that such charges "are" a lien on the lot, there is nothing to suggest that this revision in 1999 Wisconsin Act 150 was meant to change the effect of the law. *See* 1999 Wis. Act 150, prefatory note (describing that the Act was meant to recodify chapter 66 of the Wisconsin Statutes for purposes of reorganization and language modernization, and noting that the Act "[m]akes nonsubstantive, editorial changes to modernize language and reflect modern drafting style," but "unless expressly noted, . . . makes no substantive changes in the statutory provisions," which should "be construed to have the same effect as the prior statutes"); *cf. In re Delafuente*, No. 05-13151-13, 2005 WL 3628861, at *2 (Bankr. W.D. Wis. Oct. 17, 2005) ("[Former Wis. Stat. § 66.069(1)(b)] was more specific [than Wis. Stat. § 66.0809(3)] in stating that taxes and liens on property were not effective until November 16. But, there is nothing to suggest that the changes in the language, which removed the words 'thereafter' and 'thereupon,' were intended to change the effect of the law.").

penalty on the underlying arrears before they are levied as special charges on the tax roll. According to Peete:

> [S]pecial charges (whether "property taxes" or not under Wisconsin law) are NEVER "last payable without penalty after one year before the date of the filing of the Petition", because Wisconsin special charges, when levied, are ONLY payable with a penalty. Either they were NOT a property tax (because they weren't yet levied), or, they carried a penalty – said another way, even if the moment the special charges became property taxes (if they are determined to have become so on November 15, 2020, which was within one year of the filing of the case), they were still only payable as taxes subject to a mandatory statutory penalty. Because 11 USC 507(a)(8) requires both that a debt be a "property tax" and that it be "last payable without penalty" after one year preceding filing, there is never a time at which the delinquent charges satisfy both conditions.

ECF No. 105, at 4.

The City responds that that "the timing of the tax bill and penalties thereupon controls on this analysis and therefore the Charges are not time-barred from inclusion as a priority debt." ECF No. 106, at 3.

**B. Penalty Charges**

Certain penalties related to tax charges are entitled to priority under 11 U.S.C. § 507(a)(8)(G), which affords priority to "a penalty related to a claim of a kind specified in this paragraph [i.e., a tax] and in compensation for actual pecuniary loss."

The debtor asserts that the $747.62 in penalty charges added to the 2020 tax bill does not qualify for priority status under this section of the Code (or any other). The City offers no plausible argument to the contrary, instead contending that the penalties are not dischargeable under 11 U.S.C. § 523(a)(7) (which applies to a debt "for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, [that] is not compensation for actual pecuniary loss, other than a tax penalty—(A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition . . . ."). *But see* 11 U.S.C. § 1328(a) (allowing for the discharge of debts described in § 523(a)(7)). In so arguing, the City essentially concedes that the

penalties do not fall within the scope of section 507(a)(8)(G): "Relative to the instant case, $2,242.87 identified as 'Interest and Penalties' for the 2020 tax year is comprised of $747.62 in penalties, representing 3% of the outstanding balance as noted above, and the remainder is attributable to interest. This 3% penalty is the result of nonpayment, not in compensation for pecuniary loss . . . ." ECF No. 120, at 2.

## ANALYSIS

**A.     Burden of Proof**

While a properly filed proof of claim generally is prima facie evidence of the validity and amount of the claim, *see* Fed. R. Bankr. P. 3001(f), the same evidentiary presumption does not apply to a claim's priority status. Instead, the party seeking to establish a priority claim bears the burden of proving that the claim is entitled to priority treatment. *See, e.g., In re Alewelt,* 520 B.R. 704, 708–10 (Bankr. C.D. Ill. 2014) (noting that a determination of *how* claims are paid, including whether they are entitled to priority status under § 507, is made independent of the claims-allowance process governed by § 502 and Rule 3001(f), and concluding that the creditor had the burden to prove by the preponderance of evidence that his claim was entitled to priority treatment); 4 *Collier on Bankruptcy* ¶ 507.01 (16th ed. 2022); *In re Cousins,* 601 B.R. 609, 612 (Bankr. E.D. La. 2019) ("The IRS seeks priority status, thus, it has the burden of proving the SRP falls within § 507(a) defining priority claims."); *see also In re Drengacz,* No. BR 11-B-82339, 2012 WL 5467757, at *4 (Bankr. N.D. Ill. Nov. 9, 2012) ("While a proof of claim may be prima facie evidence of the *amount* and *validity* of a claim, a claimant bears the burden of proving that he is entitled to priority status under Section 507(a)(1).").

Here, the City of Milwaukee seeks priority status for its claim, so it bears the burden of proving that the charges at issue fall within the scope of § 507(a)(8).

**B.     Property Taxes**

Because the priority granted by § 507(a)(8)(B) extends not to every obligation owed to governmental entities, but only to property taxes (specifically, those incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition), the Court first must determine whether the special charges included in the City's claim are a "tax." That determination is a federal question. *See, e.g.*, *Groetken v. State of Ill., Dep't of Revenue* (*In re Groetken*), 843 F.2d 1007, 1013 (7th Cir. 1988); *In re S.N.A. Nut Co.*, 188 B.R. at 393.

How state statutes may label the water charges here, or other components of the special charges, is not controlling. "To determine whether an exaction is a tax, one ignores the label given to the exaction by Congress and instead looks to how the exaction operates . . . ." *In re Huenerberg*, 590 B.R. 862, 865–66 (Bankr. E.D. Wis. 2018), *aff'd sub nom. Internal Revenue Serv. v. Huenerberg*, 623 B.R. 841 (E.D. Wis. 2020). In effect, *Huenerberg* paraphrases and applies the functional analysis of *Reorganized CF & I Fabricators*. *See also Oneida Tribe of Indians of Wisconsin v. Vill. of Hobart, Wis.*, 891 F. Supp.2d 1058, 1064 (E.D. Wis. 2012), *aff'd sub nom. Oneida Tribe of Indians of Wis. v. Vill. of Hobart, Wis.*, 732 F.3d 837 (7th Cir. 2013) (citing *Carpenter v. Shaw*, 280 U.S. 363, 368-69, 50 S. Ct. 121, 74 L.Ed. 478 (1930) ("Where a federal right is concerned we are not bound by the characterization given to a state tax by the state courts or legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted.")). In *Huenerberg,* the bankruptcy court summarized:

> The Supreme Court has ruled that, for purposes of priority in bankruptcy, an exaction operates as a tax when it lays "a pecuniary burden . . . upon individuals or property for the purpose of supporting the Government"; when it "is an enforced contribution to provide for the support of government"; or when it lays a "pecuniary burden[ ] . . . upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it".

590 B.R. at 866 (internal citations and quotations marks omitted).

The Seventh Circuit articulated a similar standard a few years earlier when considering whether a stormwater management charge was an impermissible "tax" against tribal lands, or a permissible "fee":

> In *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* 651 F.3d 722, 728 (7th Cir. 2011) (en banc), we rejected the cumbersome multifactor tests that some courts had used to try to distinguish between taxes and fees. We said that
>
>> the only material distinction [between taxes and fees] is between exactions designed to generate revenue—taxes, whatever the state calls them . . . —and exactions designed either to punish (fines, in a broad sense) rather than to generate revenue (the hope being that the punishment will deter, though deterrence is never perfect and therefore fines generate some state revenues), or to compensate for a service that the state provides to the persons or firms on whom or on which the exaction falls (or, what is similar, to compensate the state for costs imposed on it by those persons or firms, other than costs of providing a service to them): in other words, a fee.

*Oneida*, 732 F.3d at 841–42. *See also Oneida*, 891 F. Supp. 2d at 1065 ("If the exaction is imposed by the legislature upon all, or almost all, of the citizens or property to accomplish a general public purpose, it is more likely to be a tax. If, on the other hand, the charge is imposed by a government agency on a specific subset of citizens or conduct subject to regulation by the agency and is set at such amount as to discourage certain conduct or defray the costs of the agency, it is a fee.").

Here, the Court must look at each of the special charges at issue and conduct a functional analysis; that is, it must determine whether the charges generate revenue for general public purposes, or for the regulation and benefit of the parties upon whom the fees are imposed. For ease of analysis, the Court will consider separately the charges collected by Milwaukee Water Works, and those collected by the Department of Neighborhood Services.

### 1. MWW Charges

Despite the opportunity to supplement the record more than once, the City of Milwaukee has failed to provide any evidence to establish the nature and purpose of the charges imposed for "municipal services," "storm water,"

"water," and "sewer." While it is likely that some of the charges are to recover the costs of the City providing services to Peete (and based on a property owner's water usage, rather than land ownership), it is just as likely that some of the charges are not. For example, as the district court observed in *Oneida,* charges imposed for storm water management are often found to be taxes rather than fees:

> Finally, the revenue generated by the fees [Storm Water Utility Management charges] is for a public benefit, as opposed to the individual owners of the property upon which the charges are assessed. . . . Storm water run-off can carry pollutants into waterways and thereby cause damage to the environment. But the resulting damage is to the public generally, not the individual property owner. Everyone who lives in the Village, and even many outside the Village boundaries, have an interest in preventing environmental damage due to storm water run-off.

891 F. Supp. 2d at 1066 (citing *McLeod v. Columbia Cnty, GA*, 254 F.Supp.2d 1340, 1348 (S.D. Ga. 2003) ("Storm water management was and is the type of service that is often funded through general tax revenue.")). But without *evidence* to support such a finding, the Court cannot reach that conclusion.

Because the City bears the burden of proving that its special charges are "property taxes" entitled to priority, its failure to provide the necessary evidence requires the Court to find, based on this record, in favor of Mr. Peete. As a result, the special charges added to Peete's 2020 tax bill by Milwaukee Water Works are not entitled to priority status and will be treated like other general unsecured claims.

### 2. DNS Charges

The two remaining special charges are for "health abatement" and "building reinspection." These charges both appear to have been assessed not for a public benefit, but to recover the City's costs in cleaning up litter at Mr. Peete's property, and for performing required inspections at his property based on his failure to remedy building code violations. These are not charges imposed on all property owners in a community, nor do they generate revenue to benefit the general public. Instead, they are meant to discourage unwanted conduct—littering and failing to remedy identified building code violations—as

well as to defray the City's costs in providing services to specific property owners. These charges are a fee, not a tax. Consequently, the special charges imposed by the DNS likewise are not entitled to priority status, and will be treated like other general unsecured claims.

Because the City has failed to prove that any of the special charges added to Mr. Peete's 2020 tax bill are "property taxes," the Court need not reach the secondary question of whether any of the charges were last payable without penalty within a year prior to the petition date.

**C.    Interest and Penalties**

The final question for the Court is whether any of the "interests & penalties" of $2,242.87 attributable to Mr. Peete's 2020 tax bill are entitled to priority status. This amount represents 6% interest charge ($1,495.25) and a 3% penalty charge ($747.62) on the unpaid balance (including both the tax principal and the "special charges") of $24,920.70.

The City has offered no viable argument that any of the penalty charges are entitled to priority under 11 U.S.C. § 507(a)(8)(G) (which affords priority to "a penalty related to a claim of a kind specified in this paragraph [i.e., a tax] and in compensation for actual pecuniary loss") or otherwise. No portion of the penalty charge of $747.62 is entitled to priority status.

As for the interest charges, to the extent they are attributable to the $903.36 tax principal (rather than the special charges that the Court has concluded are not entitled to priority), those amounts are entitled to priority status. *See, e.g., In re Larson*, 862 F.2d 112, 125 (7th Cir.1988) (pre-petition interest is to be accorded the same priority as the underlying claim for taxes, because the definition of a claim under § 101(4)(A) as a "right to payment" includes interest accumulated on that claim). The portion of prepetition interest attributable to the principal tax is $54.20 (6% of $903.36).

In sum, the portion of the City's claim entitled to priority status under 11 U.S.C. § 507(a)(8)(B) is $957.56 ($903.36 in tax principal and $54.20 in

prepetition interest). The remainder of the unsecured portion of the City's claim will be treated as a general unsecured claim.

## CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORERED that the debtor's objection to the City of Milwaukee's proof of claim is SUSTAINED. The City's proof of claim, in the amount of 46,754.99, shall be treated as follows:

1. $20,000 is secured by the debtor's real property;
2. $957.56 is afforded priority status under 11 U.S.C. § 507(a)(8)(B); and
3. The remaining $25,797.43 is a general unsecured claim.

IT IS FURTHER ORDERED that the City of Milwaukee's objection to confirmation of the debtor's plan is OVERRULED to the extent inconsistent with this decision.

Dated: June 30, 2022

By the Court:

Beth E. Hanan
United States Bankruptcy Judge